IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SIDNEY NAIMAN,

       Plaintiff,

   v.

TOTAL MERCHANT SERVICES, INC. and QUALITY MERCHANT SERVICES, INC.,

       Defendants.

Case No. 17-cv-03806

ORDER GRANTING MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, ATTORNEYS' FEES AND COSTS, SERVICE AWARD, AND COSTS OF SETTLEMENT ADMINISTRATION

(Dkt. Nos. 103, 104, 112)

     This proposed class action arises out of alleged violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, based on the making of unsolicited calls to cellular phones without the recipients' prior express consent.  Plaintiff Sidney Naiman moves for final approval of a settlement agreement he reached with Defendant Total Merchant Services, Inc. (Total Merchant), which this Court preliminarily approved on November 13, 2018.  See Docket No. 102.  Additionally, Naiman and his counsel move for an award of attorneys' fees of twenty-five percent of the Settlement Fund, or $1,875,000; reimbursement of attorneys' costs of $20,591.19; a $10,000 service award for Naiman; and costs of settlement administration not to exceed $128,530.  No party has opposed these motions, and no objections have been filed.  The Court held a final fairness hearing on April 2, 2019.  The parties filed supplemental materials containing information responsive to questions that the Court asked during the final fairness hearing.  See Docket Nos. 110, 111, 112.  The Court GRANTS the motions as set forth below.

BACKGROUND

I.  Claims and Procedural History

The Second Amended Complaint (2AC), filed on November 7, 2017, is the operative complaint.[2]  2AC, Docket No. 41.  In that pleading, Plaintiff Sidney Naiman[3] asserts claims under the TCPA[4] on his own behalf and on behalf of a proposed nationwide class against four defendants: Total Merchant; Quality Merchant Services, Inc. (Quality Merchant); Michael Alimento, the alleged owner of Quality Merchant; and Bobby Powers, the alleged territory owner of Total Merchant.  Id. ¶¶ 4-7.

The gravamen of the 2AC is that Quality Merchant made unsolicited, pre-recorded phone calls using an automatic telephone dialing system (ATDS) to the cellular phones of Naiman and other persons to market the services of Total Merchant.  Id. ¶¶ 55-67.  Naiman alleges that he never consented to receiving these calls and that such calls caused him injury because his cell phone provider charged him for them and because they

_____

[2] The original complaint was filed on July 5, 2017.  Docket No. 1.
[3] The 2AC contains individual and proposed class claims under the TCPA by a second plaintiff, Timothy Collins, whose claims were dismissed from the action by stipulation on August 31, 2018. Docket No. 91.  Collins' claims were based on allegations that Defendant Bobby Powers sent him and others unsolicited facsimile advertisements on behalf of Total Merchant.  2AC ¶¶ 41-54. Because these claims and allegations have been dismissed and are not a part of the Settlement Agreement, they are not addressed in the remainder of this Order.
[4] The TCPA makes it unlawful, in relevant part, "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . or any service for which the called party is charged for the call[.]"  47 U.S.C. § 227(b)(1)(A).  The TCPA provides a private cause of action to persons who receive calls in violation of that statute.

2

United States District Court
Northern District of California

rendered his cell phone unavailable for other calls.  He also alleges that Total Merchant is vicariously liable for the calls at issue because Quality Merchant made them on behalf of Total Merchant.

Naiman conducted discovery, including written discovery and depositions.  Declaration of Anthony I. Paronich ¶¶ 4-9, Docket No. 103-7.  Naiman also filed motions to compel Defendants to produce documents, and to strike an answer to a prior iteration of the complaint.[5]  Id.

On June 21, 2018, the parties filed a stipulated dismissal without prejudice of all claims asserted against Michael Alimento.  Docket No. 77.  On April 11, 2019, Naiman filed a notice dismissing without prejudice all claims against Bobby Powers, who has not appeared in the action.  Docket No. 111.

Naiman filed a motion for class certification on July 10, 2018.  Docket No. 80.  While the motion for class certification was pending, on July 24, 2018, Naiman and Total Merchant participated in a mediation before mediator Peter Grill in Florida.  Paronich Decl. ¶ 5.  The case did not settle on that date, but the parties continued their arm's-length negotiations and ultimately reached a settlement agreement on August 29, 2018.[6]  Id. ¶ 2.

---

[5] The motion to strike, which was granted, pertained to the answer filed on behalf of Quality Merchant.  See Docket No. 53.

[6] The Settlement Agreement was not signed by Quality Merchant, even though Quality Merchant continues to be a Defendant.  It was signed only by Plaintiff and his counsel, and Total Merchant and its counsel.  See Settlement Agreement at 46, Docket No. 92-1.  Total Merchant is defined in the Settlement Agreement as including any of its agents, including Quality Merchant.  Settlement Agreement § 1.24, Docket No. 92-1.

II.   Preliminary Approval of the Settlement Agreement

On August 31, 2018, Naiman filed a motion for preliminary approval of a class action settlement.  Docket No. 92.  The Court held a hearing on this motion, which was unopposed, on October 9, 2018.  In accordance with the Court's comments at the hearing, the parties modified certain provisions of the Settlement Agreement (SA), Docket No. 92-1, and filed a stipulation reflecting such changes, see Stipulation as to Changes to Class Action Settlement, Docket No. 101-1.

The Court granted preliminary approval of the modified settlement agreement (Final Settlement Agreement) on November 13, 2018.  Order, Docket No. 102.  The Court appointed Plaintiff Naiman as representative of the Settlement Class and his attorneys as Class Counsel for the Settlement Class.  Id. ¶¶ 3-4. The Court also appointed Epiq Class Action & Claims Solutions, Inc. (Epiq) as Settlement Administrator.  Id. ¶ 8.

Under the terms of the Final Settlement Agreement, Total Merchant agreed to pay $7,500,000 into a non-reversionary Settlement Fund, out of which the following expenses will be paid: (1) attorneys' fees not to exceed twenty-five percent of the Settlement Fund, or $1,875,000; (2) attorneys' costs (which are not specified in the Settlement Agreement, but which Naiman represented in his motion for preliminary approval as totaling no more than $20,591.19); (3) an incentive award to Plaintiff Naiman of up to $10,000; and (4) costs of settlement administration (which are not specified in the Settlement Agreement but which Epiq estimates will not exceed $128,530).

//

4

Any funds remaining in the Settlement Fund after these expenses are paid will constitute the Settlement Class Recovery, which will be distributed pro rata to Settlement Class members who filed a valid claim by February 4, 2019, based on the number of calls they received relative to the number of calls received by class members who filed valid claims.  SA §§ 1.43, 4.3, 5.4; Order, Docket No. 102 ¶ 24.

The Court conditionally certified a Settlement Class for settlement purposes only comprised of:

> All persons within the United States to whom Quality Merchant Services, Inc., Michael Alimento, and/or Brian Alimento made a telephone call using the Spitfire dialing software[7] and/or system to any telephone number assigned to a cellular telephone service for the purpose of promoting Defendant's goods or services from July 5, 2013 through June 8, 2018. <u>These individuals are identified on the Class List.</u> Excluded from the Settlement Class are the following: (i) any trial judge who may preside over this Action; (ii) Defendant; (iii) any of the Released Parties; (iv) Class Counsel and their employees; (v) the immediate family of any of the foregoing Persons; (vi) any member of the Settlement Class who has timely submitted a Request for Exclusion by the Objection/Exclusion Deadline; and (vii) any Person who has previously given a valid release of the claims asserted in the Action.

Docket No. 101-1 ¶ 5; Docket No. 102 (emphasis added).

Any amounts remaining in the Settlement Fund after the initial round of distributions will be re-distributed to Settlement Class members who submitted valid claims in a second round, also on a pro rata basis based on the number of calls each received relative to the number of calls received by class

---

[7] The Spitfire dialer is a type of ATDS that Quality Merchant allegedly used to make the calls at issue.  Docket No. 104 at 2.

United States District Court
Northern District of California

United States District Court
Northern District of California

members who filed valid claims, except that no check of less than five dollars will be issued. SA § 4.3(d); Docket No. 101-1 ¶ 7. Any amounts remaining after the second round of distributions will be distributed to the National Consumer Law Center.[8] SA §§ 4.3(d), 1.15; Docket No. 101-1 ¶ 7.

No distributions to the Settlement Class members will be made until the settlement becomes "effective," (i.e., the Court issues an order finally approving the Settlement Agreement and dismissing the action with prejudice, or all appeals are finalized and dismissed and the Settlement Agreement is left materially intact). SA §§ 1.18, 4.3(a). Payments to Settlement Class members who filed a valid claim will be made within 60 days of the "effective date." Id. § 4.3(b).

III.  Notice, Objections, and Exclusions

The Court approved the proposed Class Notice, as revised and reflected in Docket No. 101-1. It required Epiq to set up a website containing a "long form" notice and other information

---

[8] The Court finds that the National Consumer Law Center is an appropriate cy pres recipient. Naiman has shown that the work of this organization, which is national in scope, is sufficiently tethered to the objectives of the TCPA. See Koby v. ARS Nat'l Servs., Inc., 846 F.3d 1071, 1080 (9th Cir. 2017) (holding that a cy pres award must be "tethered to the objectives of the underlying statutes or the interests of the class members," which includes having a geographic nexus). Other courts have approved cy pres distributions to the National Consumer Law Center in consumer class actions, including ones under the TCPA. See, e.g., Lee v. Glob. Tel*link Corp., No. 215CV02495ODWPLA, 2018 WL 4625677, at *9 (C.D. Cal. Sept. 24, 2018) (noting that "[t]he National Consumer Law Center advocates against automated calls and will further the goals of the absent class members" and granting final approval to settlement in TCPA class action wherein the National Consumer Law Center is cy pres recipient); Miller v. Ghirardelli Chocolate Co., No. 12-CV-04936-LB, 2015 WL 758094, at *9 (N.D. Cal. Feb. 20, 2015) (approving National Consumer Law Center as cy pres recipient in consumer class action).

relevant to the Final Settlement Agreement and this litigation, and to set up a toll-free number; it also required Epiq to mail via first-class mail a postcard notice by December 4, 2018, "to the names and addresses associated with the telephone numbers of the Settlement Class as reflected in the Class List."  SA § 7.2(a); Order, Docket No. 102 ¶ 10.

The total number of phone numbers that were called as part of the telemarketing campaign at issue was 50,417.  See Supp. Submission at 2, Docket No. 110; Supp. Declaration of Angie Birdsell ¶¶ 4-7, Docket No. 110-1.  The total number of people associated with these phone numbers is 51,035; accordingly, the Class List and the Settlement Class contain 51,035 people.  Id. Epiq was able to obtain addresses for members of the Settlement Class as follows.  Epiq received a list of 50,417 affected phone numbers, as well as 160 spreadsheets containing 224,046 names, physical addresses, and phone numbers potentially relating to users of the 50,417 affected numbers.  Id.  Only 40,588 numbers could be matched to contact information based on these records; Epiq sent the remaining 9,829 phone numbers to third parties (including Pacific East, LexisNexis, and Transunion) to perform "reverse lookups," which resulted in addresses for 9,719 numbers.  Id.

In total, Epiq was able to obtain 51,035 addresses.  Supp. Birdsell Decl. ¶ 7.  Before mailing the postcards, Epiq checked the available addresses against the National Change of Address Database and made any necessary adjustments to the addresses. Declaration of Cameron Azari ¶ 14, Docket No. 104-1.  Epiq then mailed 51,035 postcard notices on December 4, 2018.  Id. ¶ 15.  A

total of 8,559 postcards were returned as undeliverable.  Id. ¶
18.  The Settlement Administrator will maintain records of
attempts and actual deliveries of the postcard notice for at
least five years.  Docket No. 101 at 8.

The deadline to request an exclusion from the Settlement
Agreement, to object, or to submit a claim was February 4, 2019.
Order, Docket No. 102 ¶ 24.  4,424 people filed valid claims,
twenty-eight opted out, and none objected.  Azari Decl. ¶¶ 24-25;
see also Docket No. 104-1 at 70 (listing the twenty-eight opt-
outs).

ANALYSIS

The settlement of class claims requires court approval.
Fed. R. Civ. P. 23(e).  Where the parties settle their claims
before the class has been certified, courts "must peruse the
proposed compromise to ratify both (1) the propriety of the
certification and (2) the fairness of the settlement."  Staton v.
Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003).

I.   The Settlement Class Can Be Certified for Settlement Purposes

The Court first must determine whether the Settlement Class
satisfies the requirements of Rule 23(a): numerosity,
commonality, typicality, and adequacy of representation.  See
Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).
The Court also must determine whether the Settlement Class is
maintainable under Rule 23(b)(1), (2), or (3).  Id. at 1022.

The Settlement Class, as defined above, satisfies these
requirements and can be certified for settlement purposes.

The Settlement Class includes more than 50,000 persons,
which meets the numerosity requirement.  There are questions of

law and fact common to the Settlement Class members, including

whether the telemarketing campaign at issue violated the TCPA and

whether Defendant Total Merchant is vicariously liable for

Quality Merchant's actions as part of that campaign.  The claims

of Naiman are typical of the claims of the Settlement Class

members because they arise from the same conduct by Defendants

and are based on the same legal theories.  Naiman and his counsel

will fairly and adequately represent the interests of the

Settlement Class; the record lacks any indication that Naiman or

his counsel has any conflict of interest with members of the

Settlement Class, and it shows that counsel have significant

experience in litigating complex class actions such as this one.

The Court further finds that, under Rule 23(b)(3), (1)

questions of law and fact common to the Settlement Class members,

such as whether Quality Merchant made the calls at issue using an

automated telephone dialing system or a pre-recorded message;

whether Quality Merchant acted willfully when making the calls at

issue; and whether Total Merchant is vicariously liable for the

calls made by Quality Merchant, predominate over any questions

affecting only individual Settlement Class members; and (2) a

class action is superior to other available methods for the fair

and efficient adjudication of the claims, because, in the absence

of a class action vehicle, members of the Settlement Class likely

would not litigate their claims against Defendants individually

given that the potential recovery for each is modest relative to

the costs required to pursue individual litigation.

//

United States District Court
Northern District of California

II.   The Settlement Is Fair, Adequate, and Reasonable

Next, the Court must determine whether the proposed settlement is "fundamentally fair, adequate, and reasonable." Staton, 327 F.3d at 959.  The determination to approve or reject a settlement is committed to the Court's sound discretion. Hanlon, 150 F.3d at 1026.

To determine whether a settlement is fair, adequate, and reasonable, the Court must evaluate several factors, including (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.  Id.  In addition, the Court must ensure that the settlement is not collusive.  In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 458 (9th Cir. 2000).

        A.   The Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation

This factor weighs in favor of granting final approval of the Final Settlement Agreement.

Naiman represents that the discovery exchanged to date would enable him to present a strong case against Quality Merchant; this evidence shows that Quality Merchant knowingly made unsolicited telemarketing calls to members of the Settlement Class using an ATDS.  That said, Naiman would not be able to obtain a meaningful recovery for the Settlement Class from

10

United States District Court
Northern District of California

Quality Merchant because this Defendant's net worth currently is $25,000.  Docket No. 101- 1 ¶ 4.  To recover against Total Merchant, Naiman would need to establish that this Defendant is vicariously liable for the calls that Quality Merchant allegedly made on its behalf.  Establishing vicarious liability in the context of the TCPA requires a showing of control under common law principles of agency.  See Jones v. Royal Administration Serv's, Inc., 887 F.3d 443, 450 (9th Cir. 2018) ("A defendant is vicariously liable for violations of the TCPA where common law principles of agency would impose it.").  Because this inquiry is fact-intensive and requires the consideration of a variety of factors, continuing to litigate claims against Total Merchant under a theory of vicarious liability carries significant risk and could result in no recovery for the Settlement Class.  See id. (affirming entry of summary judgment in favor of defendant on the ground that the defendant did not exercise sufficient control over the persons who made calls in violation of the TCPA and therefore could not be vicariously liable for such calls).

Moreover, continued litigation would require investing additional time and resources on discovery, class certification, dispositive and discovery motions, trial, and appeals. Accordingly, obtaining significant and immediate recovery for the Settlement Class is superior to taking the risk of recovering less or nothing by continuing to litigate.

B.    The Risk of Maintaining Class Action Status Throughout the Trial

This factor is neutral.  Naiman notes that, even if this Court were to grant a motion for class certification, there is a

11

risk that Total Merchant "might later succeed in moving to decertify." Docket No. 104 at 9. Naiman cites cases in his motion for final approval in which courts failed to certify TCPA class actions on the ground that individual questions relating to prior express consent[9] to receiving calls such as the ones at issue would predominate over common issues. See, e.g., Bavat v. Bank of the W., No. C-13-2376 EMC, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015) (finding that there is a significant risk that the plaintiffs would be unable to maintain class-action status through trial because "courts are divided as to whether issues of individual consent predominate over common questions in TCPA class actions") (citation and internal quotation marks omitted); Donaca v. Dish Network, LLC., 303 F.R.D. 390, 401 (D. Colo. 2014) (denying motion for certification of TCPA class based in part on the absence of evidence that common issues predominate over individual questions of consent). Accordingly, the Court cannot conclude that class certification in this action could be maintained, or not, through trial.

C.    The Amount Offered in Settlement

This factor weighs in favor of granting final approval. Naiman asserts that, in light of the significant risks of continuing with this litigation, the Settlement Agreement offers the Settlement Class "exceptional legal relief." Docket No. 104 at 9. The $7,500,000 that Total Merchant has agreed to pay to settle this action represents more than six percent of the maximum recovery for the Settlement Class, which would be

---

[9] Prior express consent is an affirmative defense under the TCPA. See 47 U.S.C. § 227(b).

United States District Court
Northern District of California

$117,639,000 for all 235,278 calls at issue, assuming a recovery of $500 per call.[10]  The recovery under the Final Settlement Agreement is higher than what other courts have approved in TCPA class actions.  See, e.g., Pimental v. Google Inc., No. 11-CV-02585-YGR, 2013 WL 12177158, at *3 (N.D. Cal. June 26, 2013) (granting final approval to TCPA class settlement where "a $6 million common fund achieves approximately 3% of the maximum possible recovery").

The recovery per class member, given 51,035 Settlement Class members, would be $146.96 based on the total Settlement Fund of $7,500,000.  Actual distributions to class members, however, will be limited to the 4,424 Settlement Class members who filed valid claims.  This distribution will be based on the number of telephone calls that the claimants received, which is 23,357; the average payment to these claimants will be $1,186 or $227 per phone call.  Azari Decl. ¶ 25.

The recovery per Settlement Class member and per claimant is much greater than what courts have approved in other TCPA actions.  See, e.g., Bayat, No. C-13-2376 EMC, 2015 WL 1744342, at *5 (granting final approval to settlement in TCPA action where the recovery per class member was $2.84 and the average recovery per claimant was $151).

The Court also takes into account that Total Merchant and Quality Merchant have committed to ending their use of automatic telephone dialing systems and prerecorded voice messages to contact cellular telephones for telemarketing purposes without

---

[10] The TCPA provides a recovery of $500 per violation.  See 47 U.S.C. § 227(b)(3).

United States District Court
Northern District of California

the recipients' prior express written consent.  Docket No. 101-1
at 2.  Furthermore, Total Merchant has ended its relationship
with Quality Merchant.  SA § 4.2.

     D.    The Extent of Discovery Completed and the Stage of the
             Proceedings

     Significant discovery was conducted prior to settlement.
Naiman propounded written discovery on Defendants and conducted
depositions, which resulted in 60,000 pages of produced documents
and more than 300 pages of deposition transcripts.  Docket No.
104 at 4.  Naiman also retained an expert to assist in the review
of the discovery produced by Defendants and to identify potential
violations of the TCPA, direct or vicarious.  Id. at 10-11.

     Additionally, as discussed above, Naiman engaged in some
motion practice, including filing a motion to strike an answer, a
couple of motions to compel discovery, and a motion for class
certification, the latter of which became moot when the parties
reached a settlement agreement.

     Accordingly, the parties had sufficient information about
the strengths and weaknesses of their positions prior to
negotiating and entering into the Settlement Agreement, which
weighs in favor of granting final approval.  In re Mego, 213 F.3d
at 459 (factor weighed in favor of approving settlement where
plaintiffs had conducted significant discovery and consulted with
damages and accounting experts).

     E.    The Experience and Views of Counsel

     Naiman's counsel have significant experience in litigating
complex actions, including, in particular, TCPA and other
consumer class actions.  Declaration of Edward Broderick ¶¶ 2-9,

14

United States District Court
Northern District of California

1   Docket No. 92-2; Declaration of Jon Fougner ¶¶ 4-13, Docket No.

2   92-3; Declaration of Andrew Heidarpour ¶¶ 3-4, Docket No. 92-4;

3   Declaration of Matthew McCue ¶¶ 2-10, Docket No. 92-5; Paronich

4   Decl. ¶¶ 3-5.  Accordingly, Naiman's counsel are in a position to

5   understand the strengths and weaknesses of his and the Settlement

6   Class' claims, as well as the risks of continued litigation.

7       Naiman's counsel represent that the Settlement Agreement is

8   fair, reasonable, and adequate and in the best interests of the

9   Settlement Class.  Broderick Decl. ¶ 12; Fougner Decl. ¶ 15;

10  Heidarpour Decl. ¶ 6; McCue Decl. ¶ 13; Paronich Decl. ¶ 17.

11  Accordingly, this factor weighs in favor of final approval.  In

12  re Pac. Enters. Sec. Litig., 47 F.3d 373, 378 (9th Cir. 1995)

13  ("Parties represented by competent counsel are better positioned

14  than courts to produce a settlement that fairly reflects each

15  party's expected outcome in litigation.").

16      F.   No Governmental Agency Has Objected or Expressed
             Concern
17

18      CAFA requires that notice be provided to the appropriate

19  state and federal officials within ten days of the filing of a

20  proposed class action settlement.  See 28 U.S.C. § 1715(b).  "An

21  order giving final approval of a proposed settlement may not be

22  issued earlier than 90 days after the later of the dates on which

23  the appropriate Federal official and the appropriate State

24  official are served with the notice required under subsection

25  (b)."  Id. § 1715(d).

26      Representatives of Epiq filed declarations indicating that

27  Epiq mailed notice of the Settlement Agreement on the appropriate

28  state and federal officials on September 10, 2018, as required by

United States District Court
Northern District of California

1  CAFA.  Declaration of Stephanie J. Fiereck ¶¶ 5-7, Docket No.

2  104-1; see also Azari Decl. ¶ 11, Docket No. 104-1.

3     More than ninety days have elapsed since September 10, 2018,

4  and no government entity has filed an objection to the Settlement

5  Agreement.  Accordingly, this factor weighs in favor of granting

6  final approval.  See Garner v. State Farm Mut. Auto. Ins. Co.,

7  08-cv-1365 CW (EMC), 2010 WL 1687832, at *15 (N.D. Cal. Apr. 22,

8  2010) ("Although CAFA does not create an affirmative duty for

9  either state or federal officials to take any action in response

10  to a class action settlement, CAFA presumes that, once put on

11  notice, state or federal officials will raise any concerns that

12  they may have during the normal course of the class action

13  settlement procedures.").

14     G.   The Settlement Class Members' Response

15     The reaction of the Settlement Class Members to the Final

16  Settlement Agreement supports granting final approval.  Out of

17  51,035 members of the Settlement Class, 4,424 filed valid claims,

18  only twenty-eight opted out, and none objected.  Azari Decl. ¶¶

19  24-25; see also Docket No. 104-1 at 70 (listing the twenty-eight

20  opt-outs).  The Court finds that the lack of a significant number

21  of opt-outs and the absence of any objections strongly supports a

22  finding that the Settlement Class members' reaction to the

23  settlement is positive.

24     The Court also finds that the notice program satisfied the

25  requirements of Federal Rule of Civil Procedure 23 and due

26  process.  The notice approved by the Court and disseminated by

27  Epiq constituted the best practicable method for informing the

28

16

class about the Final Settlement Agreement and relevant aspects
of the litigation.

In accordance with the notice plan approved by the Court on
November 13, 2018, Epiq created a website and toll-free number.
The website, which contained the "long form" notice and other
relevant information about the Final Settlement Agreement and
related filings, was accessed by 12,259 visitors.[11]  Azari Decl. ¶
20.  The toll-free number, which was listed in all forms of
notice, received 1,299 calls.  Id. ¶ 22.  Epiq also sent a
postcard notice by first-class mail to 51,035 addresses.  Id. ¶
15.  Only 8,559 postcard notices were returned as undeliverable.
Id. ¶ 18.  The postcard notices reached approximately eighty-
three percent of Settlement Class members.

The Court recognizes that only eighty-three percent of the
Settlement Class members received actual notice by mail, but this
does not weigh against granting final approval because neither
due process nor Rule 23 requires that all class members receive
actual notice.  Silber v. Mabon, 18 F.3d 1449, 1454 (9th Cir.
1994) (rejecting argument that "notice must actually be received
to provide an opportunity to opt out for purposes of due process"
and holding that "the appropriate standard is the best notice
practicable") (citation and internal quotation marks omitted).
Here, the method for disseminating notice was the best
practicable in light of the circumstances.  Addresses for all

United States District Court
Northern District of California

---

[11] The website was inaccessible from December 7 to 10, 2018.
To notify the Settlement Class members of this issue and its
resolution, Epiq, at its own expense, mailed a follow-up postcard
on December 28, 2018, to 43,616 members of the Settlement Class
who had not filed a claim or whose initial postcard notice had
not been returned as undeliverable.  Azari Decl. ¶ 21.

class members were not available, even after consulting records produced in discovery and performing reverse lookups. Accordingly, combining the postcard notice with other methods of delivering information to the class, such as the website and toll-free number discussed above, satisfy the requirements of due process and Rule 23.  See Fed. R. Civ. P. 23(c)(2)(B) ("[T]he Court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.").

Further, other courts have approved TCPA settlements where a similar percentage of the settlement class received actual notice. See, e.g., Mendez v. C-Two Grp., Inc., No. 13-CV-05914-HSG, 2017 WL 2861118, at *4 (N.D. Cal. July 5, 2017) (granting final approval of settlement in TCPA class action where eighty-eight percent of the settlement class received actual notice by email); Estrada v. iYogi, Inc., No. CV21301989WBSCKD, 2016 WL 310279, at *2 (E.D. Cal. Jan. 26, 2016) (granting final approval to settlement in TCPA action where the notice was "successfully delivered" by email to eighty-five percent of the settlement class).

H.   The Settlement is Not Collusive

Where a settlement is negotiated prior to formal class certification, such an agreement "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair."  In re Bluetooth Headset

United States District Court
Northern District of California

18

<u>Prods. Liab. Litig.</u>, 654 F.3d 935, 946-47 (9th Cir. 2011) (citation omitted).

Here, the Court finds no indication that the Settlement Agreement is the result of collusion or is tainted by conflicts of interest. No portion of the Settlement Fund will revert to Total Merchant. The Settlement Agreement does not contain a clear-sailing provision, that is, Defendants have not made an agreement not to object to Class Counsel's request for attorneys' fees. <u>Cf.</u> <u>id.</u> (holding that "multiple indicia of possible implicit collusion" existed where the settlement included a "clear sailing agreement" and undistributed funds would revert to the defendant).

Further, the record indicates that Naiman and his counsel have adequately represented the interests of the Settlement Class. The settlement was reached after a mediation conducted at arm's length. Class Counsel have not requested, nor will they receive, a disproportionate distribution from the Settlement Fund. As noted above, the recovery that each Settlement Class member will receive is significant and much higher than what courts have approved as fair in other, similar actions. The distribution of settlement funds to each claimant will be pro rata, based on the number of calls each claimant received relative to the number of calls received by class members who filed valid claims. The Court finds that this method of allocation is reasonable and treats members of the Settlement Class equitably relative to each other.

//

1    III.   Service Awards

2         Service awards to class representatives compensate them for

3    the work they have done for the class, for the financial or

4    reputational risk they have undertaken in bringing the action,

5    and for their willingness to act as a private attorney general.

6    In re Mego, 213 F.3d at 463; Rodriguez v. West Publishing Corp.,

7    563 F.3d 948, 958-959 (9th Cir. 2009).  Requests for service

8    awards may be evaluated using the following five factors: (1) the

9    risk to the class representative in commencing a class action,

10   both financial and otherwise; (2) the notoriety and personal

11   difficulties encountered by the class representative; (3) the

12   amount of time and effort spent by the class representative; (4)

13   the duration of the litigation; and (5) the personal benefit, or

14   lack thereof, enjoyed by the class representative as a result of

15   the litigation.  Van Vranken v. Atlantic Richfield Co., 901 F.

16   Supp. 294, 299 (N.D. Cal. 1995).

17        Naiman requests a service award of $10,000.  At the hearing

18   on October 9, 2018, the Court indicated that the requested

19   service award of $10,000 seemed high and encouraged Naiman to

20   submit a declaration that would justify such a high award.  See

21   Tr. at 17, Docket No. 99.

22        Naiman's declaration does not support an award of $10,000.

23   It shows that his involvement was limited to collecting his own

24   call records and reviewing documents with his counsel.  Naiman

25   Decl. ¶¶ 3-4.  He did not sit for a deposition and did not have

26   to respond to written discovery.

27        In TCPA class actions in this district where the gross

28   settlement fund was in the vicinity of the one here, courts have

20

United States District Court
Northern District of California

reduced requested service awards to amounts that are much less than what Naiman requests.  See, e.g., Etter v. Allstate Ins. Co., No. C 17-00184 WHA, 2018 WL 5791883, at *4, *1 (N.D. Cal. Nov. 4, 2018) (reducing requested service award of $7,500 to $500 in TCPA class action where gross settlement fund was $6,533,250). Moreover, the Ninth Circuit has rejected service awards that were between 6.6 times to 192 times the recovery of the class members. See Radcliffe v. Experian Info. Sols. Inc., 715 F.3d 1157, 1165 (9th Cir. 2013).  Here, an award of $10,000 would be more than eight times the average payment to claimants of $1,186.

Accordingly, the Court approves a service award for Naiman of $2,500, as this amount is more commensurate to his contributions and more proportional to the recovery of other claimants.

IV.  Attorneys' Fees

Naiman's counsel seek fees of $1,875,000, which is twenty-five percent of the $7,500,000 Settlement Fund.  Docket No. 103. Counsel ask that the Court evaluate their request using the percentage-of-recovery method in lieu of the lodestar method. Defendants have not opposed this request, and none of the members of the Settlement Class has filed objections to the same.

This Court is required to analyze a request for attorneys' fees based on either (1) the lodestar method, or (2) a percentage of the total benefit made available to the settlement class.  In re Bluetooth, 654 F.3d at 942 (holding that "[w]here a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or

the percentage-of-recovery method" to determine the reasonableness of attorneys' fees).

The "lodestar method" is appropriate in class actions "where the relief sought — and obtained — is often primarily injunctive in nature and thus not easily monetized, but where the legislature has authorized the award of fees to ensure compensation for counsel undertaking socially beneficial litigation." Id. at 941. The lodestar is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. See Kelly v. Wengler, 822 F.3d 1085, 1099 (9th Cir. 2016). Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative "multiplier to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained and the contingent risk presented." Id.

The percentage-of-recovery method is appropriate "in lieu of the often more time-consuming task of calculating the lodestar" where "the benefit to the class is easily quantified," such as in common-fund settlements. See In re Bluetooth, 654 F.3d at 942. Under the percentage-of-recovery method, courts in the Ninth Circuit typically calculate twenty-five percent of the fund as the "benchmark" for a reasonable fee award, providing adequate explanation in the record of any special circumstances justifying a departure. Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. 1990). The benchmark should be adjusted when the percentage recovery would be "either too small or too large in light of the hours devoted to the case or other

United States District Court
Northern District of California

relevant factors."  Id.  When considering whether to depart from
the twenty-five percent benchmark, courts consider a number of
factors, including whether class counsel "'achieved exceptional
results for the class,' whether the case was risky for class
counsel, whether counsel's performance 'generated benefits beyond
the cash settlement fund,' the market rate for the particular
field of law (in some circumstances), the burdens class counsel
experienced while litigating the case (e.g., cost, duration,
foregoing other work), and whether the case was handled on a
contingency basis."  In re Online DVD-Rental Antitrust Litig.,
779 F.3d 934, 954-55 (9th Cir. 2015) (citation and internal
quotation marks omitted).  The "most critical factor" in
determining appropriate attorneys' fee awards "is the degree of
success obtained."  Hensley v. Eckerhart, 461 U.S. 424, 436
(1983).

Here, the requested fees are twenty-five percent of the
Settlement Fund, which is precisely at the twenty-five percent
benchmark under the percent-of-recovery method.  The Court finds
that the requested fees are reasonable in light of the highly
favorable results obtained on behalf of the Settlement Class.  As
discussed above, the recovery for the Settlement Class exceeds
the recovery achieved in other TCPA class actions.  Additionally,
counsel secured an agreement by Defendants to cease telemarketing
activity that could violate the TCPA.  The Court also takes into
account that counsel litigated this case on a contingency basis,
and undertook the risk of ultimately recovering nothing by way of
attorneys' fees or costs, while foregoing other work.

A cross-check of the requested fees against the lodestar

shows that the lodestar is thirty-three percent of the requested fees of $1,875,000.  See Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050 (9th Cir. 2002) ("Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award.").  Naiman's counsel claim 1,194.4 hours, which includes some time that they intend to spend in connection with the final fairness hearing and settlement administration.  These hours are detailed in the chart below.  The lodestar is $624,859; the requested fees of $1,875,000 correspond to a multiplier of three.

| Attorney | Hourly rate | Total Hours | Lodestar |
|---|---|---|---|
| Edward A. Broderick | $700 | 143.2 | $100,240 |
| Matthew P. McCue | $700 | 225 | $157,500 |
| Jon B. Fougner | $500 | 203.7 | $101,850 |
| Andrew W. Heidarpour | $370 | 185.7 | $68,709 |
| Anthony I. Paronich | $450 | 436.8 | $196,560 |
| **Total** | N/A | 1,194.4 | $624,859 |

The Court finds that the hours claimed are reasonable and that the rates charged are commensurate with those charged by attorneys with similar experience who appear in this Court. Approving a multiplier of three of the lodestar is supported by the record, in light of the positive result that Naiman's counsel

obtained for the Settlement Class and the risks they undertook in litigating this case, as discussed above.

V.   Attorneys' Costs

Counsel for Naiman also have applied for reimbursement of actual expenses they incurred, totaling $20,591.19.  Docket No. 103 at 20-21.[12]  The requested expenses, if approved by the Court, will be paid out of the Settlement Fund.  Defendants have not opposed the request for expenses, and none of the members of the Settlement Class has filed objections to the same.

The Court finds that the requested costs, which are for travel-related expenses, mediation, depositions, and other litigation expenses, appear to have been necessary to prosecute this action.  See Buccellato v. AT & T Operations, Inc., No. 10-cv-00463-LHK, 2011 WL 4526673, at *4 (N.D. Cal. June 30, 2011) (awarding requested litigation costs and related expenses as part of final settlement approval).  Further, these expenses are reasonable and of the type customarily billed to a fee-paying client.  Accordingly, the request for $20,591.19 in attorneys' costs is granted.

VI.   Costs of Settlement Administration

Epiq has incurred $107,764 in expenses to date in administering the settlement.  Supp. Birdsell Decl. ¶ 8, Docket No. 110-1.  Epiq represents that its total costs, including the disbursement of settlement funds and administration costs, will

---

[12] The motion for attorneys' fees and costs, Docket No. 103, provides that the total attorneys' costs incurred were $24,176, but counsel for Naiman seek reimbursement of only $20,591.19 "consistent with their promise to the Court and class members." Id. at 20-21.

United States District Court
Northern District of California

not exceed $128,530, which is the same amount that Naiman represented in his motion for preliminary approval and that the Court preliminarily approved on November 13, 2018.  Id. Accordingly, the request for costs of settlement administration of not more than $128,530 is granted.

CONCLUSION

For the foregoing reasons, the Court rules as follows:

1.  The Court has jurisdiction over the subject matter of this Action, over Plaintiff, over all members of the Settlement Class, and over Defendants.

2.  The Settlement Class, as defined above, satisfies the requirements of Rule 23 for settlement purposes only.

3.  Plaintiff Sidney Naiman is appointed as Representative for the Settlement Class, and his counsel, Edward Broderick, Matthew McCue, Jon Fougner, Anthony Paronich, and Andrew Heidarpour, are appointed as Counsel for the Settlement Class.

4.  The Court grants the motion for an award of $1,875,000 in attorneys' fees, and attorneys' costs and expenses of $20,591.19, both of which will be paid exclusively out of the Settlement Fund in accordance with the terms of the Final Settlement Agreement.  The Court, having considered the materials submitted by Counsel for the Settlement Class in support of final approval of the Final Settlement Agreement and their request for attorneys' fees, costs, and expenses, and having received no objections thereto, finds the award of attorneys' fees, costs, and expenses appropriate and reasonable, and the Court notes that the

United States District Court
Northern District of California

1  Class Notice specifically and clearly advised the Settlement

2  Class that Counsel for the Settlement Class would seek the

3  award.

4  5.  The Court authorizes the payment of a service award of

5  $2,500 for Naiman and specifically finds that amount to be

6  reasonable in light of the service performed by Naiman for

7  the Settlement Class.  This amount shall be exclusively paid

8  from the Settlement Fund in accordance with the terms of the

9  Final Settlement Agreement.  The incentive award will be

10  reported as "other income" in Box 3 of Form 1099-MISC.

11  6.  The Court authorizes the payment of no more than $128,530 in

12  settlement administration expenses to the Settlement

13  Administrator, Epiq.  This amount shall be paid exclusively

14  from the Settlement Fund in accordance with the terms of the

15  Final Settlement Agreement.

16  7.  The Court has determined that the Settlement Administrator

17  employed the best practicable method of providing notice to

18  the members of the Settlement Class, and provided individual

19  notice to all members of the Settlement Class who could be

20  identified through reasonable effort.  The Court finds that

21  the class notice sent to the members of the Settlement Class

22  satisfies the requirements of Rule 23 and due process.

23  8.  Notice to the appropriate state and federal officials was

24  properly and timely provided on September 10, 2018, as

25  required by CAFA, 28 U.S.C. § 1715.  More than ninety days

26  have elapsed since CAFA notice was provided.  No government

27  entity has objected to the Settlement Agreement.

28

United States District Court
Northern District of California

9. All persons who made timely and valid requests for exclusion are excluded from the Settlement Class and are not bound by this Final Approval Order and Judgment.  The list of persons submitting notices seeking exclusion from the Settlement Class, submitted by the Settlement Administrator pursuant to the Preliminary Approval Order, is hereby accepted as the list of persons who have made timely and valid requests for exclusion.

10. Pursuant to the Final Settlement Agreement, Total Merchant has agreed to pay seven million five hundred thousand dollars ($7,500,000) to create the Settlement Fund.  Amounts awarded to Counsel for the Settlement Class or the Representative will be paid from the Settlement Fund. Members of the Settlement Class who have submitted a valid claim will receive a share of the Settlement Fund after attorneys' fees and costs, the Representative's award, and the costs of notice and administration are deducted. Defendants have also represented that they have taken steps to ensure compliance with respect to the telemarketing violations alleged in the Second Amended Complaint, Docket No. 41.

11. The Court has read and considered the papers filed in support of the motions filed in connection with the Final Settlement Agreement, including the Settlement Agreement and the exhibits thereto, memoranda and arguments submitted on behalf of Naiman, Settlement Class members, and Defendants. The Court has not received any objections from any person regarding the Final Settlement Agreement.  The Court held a

final fairness hearing on April 2, 2019, at which time the parties were afforded the opportunity to be heard in support of or in opposition to the Final Settlement Agreement.

12. As discussed above, the Court concludes that the Final Settlement Agreement is fair, adequate, and reasonable and in the best interests of the Settlement Class, as discussed in more detail above.

13. The Settlement Administrator and the parties to the Final Settlement Agreement shall take all reasonable steps to ensure that the settlement is effectuated in a manner consistent with this Court's orders and the Final Settlement Agreement.

14. If settlement payments exceed the threshold amounts that must be reported to the Internal Revenue Service by means of a Form 1099, Counsel for the Settlement Class and the Settlement Administrator will take all necessary and reasonable steps to obtain W-9's from claimants and to comply with applicable IRS regulations on issuing 1099s without a social security number or tax entity identification number, and shall take all reasonable and necessary steps to avoid imposition of IRS penalties against the Settlement Fund, including, but not limited to, limiting payments to be below the reportable threshold and/or withholding of taxes and any applicable penalties.

15. The Court orders the parties to the Final Settlement Agreement to perform their obligations thereunder.  The Final Settlement Agreement shall be deemed incorporated

United States District Court
Northern District of California

United States District Court
Northern District of California

herein as if explicitly set forth and shall have the full
force of an order of this Court.

16. In accordance with the Final Settlement Agreement, the
Releasing Parties do hereby release and fully, finally, and
forever discharge the Released Parties from all claims,
debts, controversies, losses, liabilities, liens, demands,
causes of action, suits, damages (including, but not limited
to, actual, statutory, trebled, exemplary, or punitive),
fees (including, but not limited to, attorneys' fees),
expenses, and obligations of any kind or nature whatsoever,
whether in law or in equity, whether known or unknown, fixed
or contingent, claimed or unclaimed, direct or indirect,
individual or representative, arising out of or that was
made by Quality Merchant, Michael Alimento, and/or Brian
Alimento on behalf of Total Merchant promoting Total
Merchant goods or services by way of the actual or alleged
use of the Spitfire dialing system arising under the TCPA or
similar federal or state laws governing such matters, and
any rule or regulation thereunder, including the claims
alleged in the 2AC, from the beginning of time through the
date of signature of this Final Settlement Agreement.  This
release specifically extends to claims that the Releasing
Parties do not know or suspect to exist in their favor as of
the date of the Final Approval and Judgment, which release
is meant to and constitutes a waiver and relinquishment,
without limitation, of Section 1542 of the California Civil
Code.  See Docket No. 101-1 ¶ 9.

United States District Court
Northern District of California

17. Plaintiff and the Settlement Class members agree and covenant not to sue any of the Released Parties with respect to any of the Released Claims and agree forever to be barred from filing, instituting, maintaining, collecting, proceeding against, or seeking to establish liability against any of the Released Parties in any federal, state, or local court or forum, in or before any administrative agency, or in any other proceeding in any forum with respect to any of the Released Claims. See Docket No. 101-1 ¶ 12.

18. The Court further orders that upon the Effective Date, the above-described releases and the Final Settlement Agreement will be binding on, and have res judicata and preclusive effect in, all pending and future lawsuits or other proceedings maintained by or on behalf of the Releasing Parties.

19. Without affecting the finality of this Final Approval Order and Judgment in any way, the Court retains jurisdiction over: (a) implementation and enforcement of the Final Settlement Agreement until the final judgment contemplated hereby has become effective and each and every act agreed to be performed by the parties hereto pursuant to the Final Settlement Agreement has been performed; (b) any other action necessary to conclude the settlement and to administer, effectuate, interpret, and monitor compliance with the provisions of the Final Settlement Agreement; and (c) all parties to this Action and Settlement Class members for the purpose of implementing and enforcing the Final Settlement Agreement.

United States District Court
Northern District of California

20. Neither this Final Approval Order and Judgment as to the Defendants nor the Final Settlement Agreement shall be construed or used as an admission or concession by or against the Defendants or any of the Released Parties of any fault, omission, liability, or wrongdoing, or the validity of any of the Released Claims in any action or proceedings whatsoever.  This Final Approval Order and Judgment is not a finding of the validity or invalidity of any claims in this Action or a determination of any wrongdoing by the Defendant or any of the Released Parties.  The final approval of the Final Settlement Agreement does not constitute any opinion, position, or determination of this Court, one way or the other, as to the merits of the claims and defenses of Plaintiff, the Settlement Class members, or Defendants.

21. The Court dismisses this Action with prejudice and without costs, except as otherwise provided herein.

IT IS SO ORDERED.

Dated: April 16, 2019

_____
CLAUDIA WILKEN
United States District Judge